UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| AXIS INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:19-cv-00165-HAB-SLC |
| | ) |
| AMERICAN SPECIALTY INSURANCE | ) |
| & RISK SERVICES, INC. | ) |
| | ) |
| Defendant. | ) |

## SECOND AMENDED COMPLAINT

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, plaintiff AXIS Insurance Company ("AXIS"), for its Second Amended Complaint against defendant American Specialty Insurance & Risk Services, Inc. ("American Specialty"), states:

1. In this action, AXIS seeks damages for breaches of contracts governing American Specialty's duties, obligations, and professional services provided to and on behalf of AXIS.

2. [DELETED]

3. This dispute arises from a commercial excess insurance policy that American Specialty promoted, underwrote, bound, and delivered to a company that owns and operates a professional sports team ("Team").

4. American Specialty exceeded its authority and made errors when it underwrote, bound, delivered, and handled a claim in connection with an AXIS commercial excess insurance policy, thereby breaching American Specialty's contracts with AXIS.

5. As a direct and proximate consequence of American Specialty's breaches of its duties to AXIS and its insured, AXIS faced liability to the Team which AXIS resolved by contributing to settle a very substantial employee liability claim against the Team.

6. American Specialty has refused to indemnify AXIS for the damages it has suffered, which now exceed $4 million.

## Jurisdiction and Venue

7. The Court has original jurisdiction over this civil action for breach of contract and declaratory judgment under 28 U.S.C. § 1332(a)(1).

8. The matter in controversy exceeds $75,000, exclusive of interest, fees, and costs.

9. Plaintiff and defendant are citizens of different States.

10. Plaintiff AXIS is an Illinois corporation with its principal place of business in Alpharetta, Fulton County, Georgia.

11. Defendant American Specialty is an Indiana corporation with its principal place of business in Fort Wayne, Allen County, Indiana.

12. The venue of this action is proper in the Fort Wayne Division of the United States District Court for the Northern District of Indiana under 28 U.S.C. § 1391(b)(1) and (d).

13. American Specialty has substantial and continuous contacts with the Northern District of Indiana.

14. American Specialty regularly conducts its business at its office in Allen County, Indiana.

## Parties

15. AXIS provides many different insurance products domestically and internationally.

16. AXIS provides a broad portfolio of specialty coverages, including property and casualty, professional lines, terrorism, marine, energy, aviation, credit and political risk, environmental, accident and health, and custom insurance programs.

17. AXIS offers its products through distribution partners, which include wholesale insurance brokers, retail brokers, and designated managing general agents and underwriters (MGAs/MGUs).

18. American Specialty's business includes insurance and risk services for the sports and entertainment industries.

19. Defendant American Specialty is an affiliate of Brown & Brown, Inc., a publicly traded insurance agency and brokerage company headquartered in Daytona Beach, Florida.

### Parties' Business Relationship

20. Since 2008, American Specialty acted as an MGA/MGU, serving AXIS as one of its program managers.

21. American Specialty facilitated the promotion, underwriting, and issuance of insurance policies for AXIS.

22. In connection with AXIS's sports and leisure program, American Specialty promoted insurance products for professional and amateur sports organizations and for special events.

23. American Specialty also provided claims management services on behalf of AXIS.

24. The parties' relationship is governed by written contracts, which include: (a) the Program Manager Agreement ("PMA"), (b) the Underwriting Guidelines Addendum ("Guidelines"), and (c) the Claims Service and Management Agreement ("Claims Agreement").

25. The Guidelines and the Claims Agreement are cross-referenced and incorporated into the PMA.

**Program Manager Agreement (PMA)**

26. American Specialty agreed to comply with all obligations and faithfully perform all duties set forth in the PMA.

27. The PMA establishes and restricts American Specialty's authority to bid, underwrite, bind, and issue insurance policies and contracts on behalf of AXIS.

28. American Specialty may not underwrite, issue, deliver, or service binders or policies for insurance that would exceed the limitations of or fail to conform with the PMA.

29. American Specialty is not permitted to commit AXIS to any expense, agreement, or obligation beyond the terms of the PMA.

30. American Specialty agreed to cooperate with and assist AXIS in any matter related to the PMA.

31. American Specialty agreed to maintain and send AXIS, upon request, true, accurate, and complete copies of all business records, including underwriting files and correspondence with policyholders, brokers, and AXIS.

32. American Specialty agreed to attach to, and itemize in, each policy that it issues copies of all conditions, endorsements, terms, exclusions, and other documents that apply to or form part of the insurance policy.

33. American Specialty agreed to advise AXIS and to obtain prior approval from AXIS in writing each time American Specialty solicits, quotes, underwrites, binds, or delivers any policy that the PMA prohibits.

34. To obtain written approval, American Specialty agreed to provide AXIS with all related details and to undertake any actions that AXIS directs to remove or minimize AXIS's exposure.

35. AXIS retained the right to reject any insurance application that American Specialty received.

36. American Specialty agreed to maintain E&O insurance and to provide AXIS with proof and details of that coverage.

37. American Specialty agreed to, among other things, defend, indemnify, and hold AXIS harmless from and against all claims, causes of action, liabilities, or loss which result from any negligent or willful acts, errors, or omissions of American Specialty or its servants or employees in the performance or breach of duties under the PMA.

38. American Specialty agreed to defend, indemnify, and hold AXIS harmless from and against all claims, actions, causes of action, liabilities, or loss which results from any negligent or willful acts, errors, or omissions of any representatives, sub-producers, producers or brokers who are retained by American Specialty under the PMA or to whom American Specialty has delegated its authority under the PMA.

39. American Specialty agreed that the scope of its indemnity obligation to AXIS included all loss, including, but not limited to, all damages, costs, expenses, reasonable attorneys' fees, and other legal fees, fines, direct or consequential damages, assessments, verdicts (including punitive damages to the extent permissible by law), and any other expenses or expenditures incurred by AXIS.

40. American Specialty agreed that its indemnity obligations to AXIS survive termination of the PMA.

41. The rights and remedies available to AXIS under the terms of the PMA are not exclusive or exhaustive.

42. American Specialty agreed to be bound by certain underwriting guidelines, claims procedures, and other instructions received from AXIS.

### Underwriting Guidelines

43. The Guidelines establish and limit American Specialty's authority to underwrite insurance on behalf of AXIS as its program manager.

44. American Specialty agreed to abide by the Guidelines.

45. The Guidelines limit American Specialty's authority to solicit, bind, and underwrite insurance on AXIS's behalf to those instances permitted under the PMA and the Guidelines.

46. The Guidelines require American Specialty to document in each underwriting file all analysis and decision-making on underwriting considerations.

47. The Guidelines require American Specialty to file and maintain copies of written applications that contain all information necessary to evaluate the risks and pricing of the insurance.

48. The Guidelines authorize American Specialty to write commercial excess policies with limits only up to $5,000,000 without first providing full disclosures to and obtaining approval from AXIS.

49. The Guidelines require American Specialty to refer to AXIS those risks where the coverage is outside of the standards set forth in the Guidelines and to provide AXIS with complete underwriting analysis, rating, and pricing documentation.

50. The Guidelines prohibit American Specialty from binding policies that deviate from other limits that the Guidelines impose without AXIS's written approval.

**Claims Agreement**

51.     The Claims Agreement governs American Specialty's obligations in handling claims and in providing other administrative services for insurance policies issued pursuant to the PMA.

52.     American Specialty promised to carry out its duties under the Claims Agreement in accordance with the terms and conditions of that agreement, as well as the terms and conditions of the Appointment Addendum, the PMA (and thus also the Guidelines), and AXIS's other policies and procedures.

53.     American Specialty agreed to investigate, identify, and immediately report to AXIS any claims involving coverage issues, the coverage issues themselves, and associated facts and circumstances.

54.     American Specialty agreed to manage and service claims according to AXIS's written standards.

55.     American Specialty agreed to preserve and assert AXIS's coverage defenses.

56.     American Specialty agreed to maintain E&O and other types of insurance.

57.     American Specialty also agreed to indemnify AXIS and hold it harmless against any and all claims, loss, liability, and damages, including attorney's fees and expenses, that AXIS incurs directly or indirectly due to American Specialty's negligent or intentional actions or failure to act regarding claims handling.

**The Team's 2013 Insurance Program**

58.     During 2013, American Specialty prepared a proposal for insurance, issued a binder, and then prepared and delivered the following insurance policies to the Team's broker, Marsh USA, Inc. ("Marsh"): (1) AXIS Insurance Company Policy Number AXGL01104588-13

("AXIS GL Policy"), and (2) AXIS Insurance Company Commercial Excess Liability Policy Number AXXS01102409-13 ("AXIS Excess Policy").

59. American Specialty's involvement with the Team's 2013 liability insurance renewal began on or about May 9, 2013, the date Marsh delivered via email to American Specialty the Team's renewal application ("Application").

60. Marsh's email invited American Specialty to make a proposal to renew the Team's expiring coverages.

61. Marsh also explained in the email to American Specialty that K&K, the representative that had written the expiring policies, had decided to place a concussion exclusion on the Team's policies at renewal.

62. The Umbrella/Excess Section of the Team's Application requested renewal of a $100 million tower of excess policies.

63. The Application stated that the Team's expiring excess policies attached above three primary policies: (1) a $1 million National Casualty auto liability policy; (2) a $1 million National Casualty general liability policy; and (3) a $1 million Great Divide employers liability policy.

64. Marsh provided American Specialty with a K&K Professional Sports Information Form ("Information Form") that summarized the Team's operations, detailed its claims history, and described the terms and conditions of the Team's insurance program.

65. Like the Application, the Information Form described the Team's liability insurance program, including a $100 million tower of excess liability insurance that provided, among other things, excess follow-form employers liability coverage.

**American Specialty's Excess Policy Proposal**

66. The Team was a new account that AXIS had not previously insured.

67. American Specialty was not authorized to quote a premium for the AXIS Primary GL Policy or for the AXIS Excess Policy without prior approval from AXIS.

68. American Specialty prepared an Underwriting Narrative that suggested premium amounts to write the AXIS Primary GL Policy, the AXIS Excess Policy, and a business auto policy for the Team.

69. The Underwriting Narrative refers the general liability coverages and the commercial excess liability coverages to AXIS for approval.

70. The Underwriting Narrative does not disclose any existing or proposed renewal of primary employers liability coverage or excess employers liability coverage for the Team.

71. American Specialty also prepared as part of the referral an excess rating worksheet to support and explain the proposed premium for the AXIS Excess Policy.

72. The excess rating worksheet does not disclose any existing or proposed renewal of excess employers liability coverage for the Team.

73. During 2013, American Specialty never once disclosed to AXIS the Team's expiring employers liability coverage, the Team's desire to renew employers liability coverage, or the fact that Marsh was shopping for an alternative insurer to avoid the addition of a concussion exclusion to the Team's policies.

74. American Specialty did not forward the Application or the Information Form to AXIS at any time before issuing and binding the AXIS GL Policy and the AXIS Excess Policy.

75. On May 28, 2013, relying on the information American Specialty provided, AXIS approved the referral and authorized American Specialty to release American Specialty's

premium proposal for the AXIS GL Policy and the AXIS Excess Policy on the condition that a specific player-vs-player exclusion form was included.

76. During the afternoon of May 28, 2013, American Specialty sent an email to Marsh and enclosed American Specialty's written proposal for renewing portions of the Team's insurance program as follows:

    (a) Proposal for Insurance Commercial General Liability (Proposal # 136325-0) describes the terms and premium for a primary AXIS Insurance Company GL policy that would cover general liability, employee benefits liability, abuse-molestation liability, and liquor liability;

    (b) Proposal for Insurance Business Auto (Proposal # 136142-2) describes the terms and premium for a primary AXIS Insurance Company auto policy; and

    (c) Proposal for Insurance Commercial Excess Liability (Proposal # 136331-0) ("Excess Policy Proposal") describes the terms and premium for an AXIS Insurance Company first layer excess policy with limits of $10,000,000.

77. Without AXIS's knowledge or prior authorization, American Specialty, in its May 28, 2013 email to Marsh, offered to include employers liability coverage in the AXIS Excess Policy, provided the primary insurer was A-rated and the employers liability limits "are at least "$1,000,000/$1,000,000/$1,000,000 or higher."

78. American Specialty's Excess Policy Proposal states in the Schedule of Controlling Underlying Insurance section that a $1 million primary layer "Employer's Liability Policy" will be provided by a "TBD" insurance company and that the primary layer general liability, commercial automobile liability, abuse-molestation liability, employee benefits liability, and liquor liability coverages will be provided by AXIS Insurance Company.

79. During 2013, American Specialty never disclosed to AXIS that American Specialty had confirmed in writing to Marsh a willingness to include employers liability coverage for the Team in the AXIS Excess Policy.

### American Specialty's Excess Policy Binder

80. The policy periods for the Team's 2012-2013 liability policies expired on May 31, 2013.

81. On May 31, 2013, Marsh presented the Team with a renewal proposal that included, among other things, the terms of the American Specialty Excess Policy Proposal, which the Team accepted.

82. Marsh instructed American Specialty to prepare binders for the Team's liability insurance effective as of June 1, 2013.

83. Among the binders American Specialty prepared and sent to Marsh was a Binder for Insurance Commercial Excess Liability ("Excess Policy Binder") that was dated June 4, 2013.

84. The Excess Policy Binder identifies AXIS Insurance Company as the insurer, and it states the policy number, the policy period, the effective date, the coverage form, the premium, and $10,000,000 limits for the AXIS Excess Policy.

85. Like the American Specialty Excess Policy Proposal, the Excess Policy Binder includes a Schedule of Controlling Underlying Insurance that states a $1 million primary layer "Employer's Liability Policy" will be provided by a "TBD" insurance company.

86. By letter dated June 10, 2013, Marsh delivered the Excess Policy Binder and other insurance binders to the Team.

87. Marsh's June 10, 2013 letter describes the AXIS Excess Policy, and Marsh states in the "Binder Corrections" section that "Employer's Liability policy information for the underlying schedule needs to be revised."

### American Specialty's Preparation of the AXIS Excess Policy

88. American Specialty prepared the AXIS Excess Policy and delivered it to Marsh.

89. Without any further discussions about the matter with the Team, with Marsh, or with AXIS, American Specialty changed the Schedule of Controlling Underlying Insurance and inserted a different version in the delivered AXIS Excess Policy.

90. Whereas the American Specialty Excess Proposal and the Excess Policy Binder described an underlying $1 million primary employers liability policy from an insurance company that was "TBD," American Specialty unilaterally changed the Schedule of Controlling Underlying Insurance in the delivered AXIS Excess Policy to remove that coverage.

91. The delivered AXIS Excess Policy states that the employers liability primary insurer, the policy number, the policy period, and the underlying policy limits for employers liability coverage were "N/A."

92. The AXIS Excess Policy that American Specialty prepared and delivered to Marsh is inconsistent with the Team's Application for an excess policy.

93. The AXIS Excess Policy that American Specialty prepared and delivered to Marsh is also inconsistent with the American Specialty Excess Proposal, and the Excess Policy Binder, because American Specialty unilaterally decided that employers liability coverage would not be determined and was no longer applicable to the AXIS Excess Policy.

**The Player's Claim**

94. During the summer of 2013, while the AXIS GL Policy and AXIS Excess Policy were in force, a professional athlete ("Player") for the Team contracted an illness allegedly at the Team's training facility.

95. On August 16, 2013, a workers compensation claim was presented to Great Divide Insurance Company ("Great Divide") in connection with the Player's injuries.

96. On December 2, 2013, Great Divide denied the Player's claim for workers compensation benefits after determining that the workplace was not the major cause of his illness.

97. On March 2, 2015, the Player, through his attorney, made a written demand to settle all claims for $10,500,000 and enclosed a draft complaint against the Team and the owner of the training facility (the "Claim").

98. At the time of the Player's alleged injuries in 2013, the Team had in place a $1,000,000 primary employers liability insurance policy issued by Great Divide as Policy No. WCA 1520486-13 ("Great Divide Policy").

99. On March 5, 2015, American Specialty sent to AXIS via email copies of the Player's demand letter and draft complaint, and copies of the AXIS GL Policy and AXIS Excess Policy that American Specialty prepared in 2013.

100. American Specialty also told AXIS in that email that the Claim had been submitted to the Team's "workers comp carrier" and suggested engaging coverage counsel.

101. On March 24, 2015, AXIS denied coverage for the Claim and declined to defend the Team under the AXIS GL Policy and under the AXIS Excess Policy.

102. On March 24, 2015, AXIS sent a reservation of rights letter in which it agreed to defend the owner of the Team's practice facility against the Claim only under the AXIS GL Policy.

103. On April 10, 2015, Marsh contacted American Specialty via email and asked for an explanation why employers liability coverage was "left off" the AXIS Excess Policy.

104. On April 13, 2015, Bonnie Rickard, who was Senior Vice President & Underwriting Operations Manager at American Specialty, sent an email to Stan Sheehan, Senior Vice President and Chief Underwriting Officer at American Specialty, and said, "Stan – the EL was shown on the application, proposal and binder – then seemed to drop of[f] the planet when the policy was issued. It's very clear that it should be on the policy as well."

105. On April 17, 2015, American Specialty informed AXIS for the first time that the Team had requested scheduling employers liability coverage in the AXIS Excess Policy, that American Specialty's Excess Policy Proposal and Excess Policy Binder "both show EL as an underlying coverage," and that "[t]he policy as issued by mistake did not schedule the EL."

106. On May 4, 2015, AXIS, by its coverage counsel, emailed a letter to American Specialty.  AXIS disagreed with American Specialty's interpretation of the Excess Policy Proposal and the Excess Binder.

107. AXIS also noted that American Specialty had no authority to unilaterally bind any excess employers liability for the Team under the Guidelines.

108. AXIS also stated that American Specialty had no further authority with respect to handling the Claim.

109. On May 14, 2015, Stan Sheehan responded to the May 4, 2015 letter via email on behalf of American Specialty and admitted that because of "a clerical error," the AXIS Excess Policy does not conform to the Excess Policy Binder that American Specialty issued.

110. Stan Sheehan requested AXIS to reconsider and reform the AXIS Excess Policy to reflect what he stated was the intent of the parties to schedule a controlling underlying employers liability policy.

111. AXIS declined to reform the AXIS Excess Policy with regard to employers liability coverage.

112. AXIS demanded that American Specialty indemnify AXIS for the mistakes American Specialty had made as to the AXIS Excess Policy.

113. AXIS requested confirmation that American Specialty had notified its E&O liability insurer of the indemnity demand.

114. American Specialty did not respond to AXIS concerning indemnity or any notice to an E&O insurer.

115. The Player filed a lawsuit ("Lawsuit") against the Team and the owner of the practice facility seeking more than $20 million in damages, which far exceeded the combined limits of the Great Divide Policy and the AXIS Excess Policy.

116. The Player and the Team continued to litigate the Claim during 2015 and 2016, and Great Divide defended the Team pursuant to the Great Divide Policy.

117. During the summer of 2016, the Player settled its claim against the practice facility owner, and that entity was dismissed from the Lawsuit.

**Settlement of the Player's Claim Against the Team**

118. On September 13, 2016, the Team's coverage attorney notified Marsh, AXIS, and American Specialty that a settlement or judgment on the Claim was likely to exhaust the Great Divide Policy, and she demanded that AXIS reform the AXIS Excess Policy to correct American Specialty's error and confirm the availability of $10 million in excess coverage.

119. On October 5, 2016, the Team's coverage attorney sent another letter to representatives of AXIS, American Specialty, and Marsh and demanded that each company send representatives to participate in a court-ordered mediation of the Player's claim.

120. On November 7, 2016, coverage counsel for AXIS sent letters to American Specialty, Marsh, and the Team that explained why AXIS would not reform the AXIS Excess Policy and would deny employers liability coverage under that policy.

121. AXIS also asked American Specialty and Marsh to meet and discuss whether a "market solution" could be reached to resolve the dispute and settle the Lawsuit for an amount significantly less than the $20 million the Player was then demanding.

122. Marsh refused to meet with AXIS and insisted that AXIS reform the AXIS Excess Policy with regard to employers liability coverage.

123. American Specialty did not respond to AXIS's request to discuss a market solution or the mediation.

124. On December 12, 2016, Brown & Brown, on behalf of American Specialty, sent a letter to the Team's coverage attorney, and contrary to the emails that American Specialty sent to AXIS in 2015, Brown & Brown took the position that Marsh first asked American Specialty in April 2015 to add employers liability coverage to the AXIS Excess Policy, not in 2013 when American Specialty proposed, bound, and delivered the policy.

125. On December 19, 2016, the Player, the Team, Great Divide, and AXIS participated in the court-ordered meditation of the Player's Claim, but Marsh and American Specialty did not attend and refused to participate in any part of the mediation.

126. On December 24, 2016, confidential settlements were reached among the Player, the Team, Great Divide, and AXIS.

127. In February 2017, AXIS paid its settlement contribution, and thereafter, the Lawsuit was dismissed with prejudice ("Settlement").

128. As part of the Settlement, the Team released AXIS as to all liability related to the Claim, but as to future claims, the Team refused to release its right to demand reformation of and to seek excess employers liability coverage under the AXIS Excess Policy.

### AXIS's Claims Against American Specialty

129. Despite demands, American Specialty has not indemnified AXIS for the Settlement or for any other direct or consequential damages, including prejudgment interest under Indiana Code ch. 24-4.6-1, legal fees, costs, and expenses.

130. The PMA and Claims Agreement contain binding arbitration clauses.

131. AXIS timely initiated a commercial arbitration proceeding against American Specialty.

132. AXIS and American Specialty were unable to agree on the members of the arbitration panel, and they mutually agreed to allow AXIS to dismiss the arbitration without prejudice and to litigate their dispute in this Court.

### Count I

133. AXIS restates and incorporates by reference each of the foregoing paragraphs 1 through 132 as if fully set forth herein.

134. As set forth above, AXIS and American Specialty are parties to the PMA, the Guidelines, and the Claims Agreement, which are binding contracts.

135. American Specialty committed acts, errors, and omissions that resulted in loss or harm to AXIS.

136. American Specialty materially breached the PMA and related agreements, all of which are incorporated by reference into the PMA, by, among other things, failing to (a) fully inform and obtain necessary underwriting approval from AXIS, (b) schedule any primary employers liability insurer or underlying employers liability policy, (c) maintain complete and accurate paperwork relating to the policies issued to the Team, (d) protect AXIS's interests in its claims handling and preserve AXIS's defenses, and (e) indemnify AXIS.

137. American Specialty's breaches of these contracts have damaged AXIS.

138. All conditions precedent to AXIS's claim for breaches of the contracts have been performed, have occurred, have been waived, or have been excused.

WHEREFORE, AXIS requests the Court to:

(a) award judgment in favor of AXIS for its damages according to proof, which currently exceed $4 million, including prejudgment interest at Indiana's eight percent (8%) annual statutory rate;

(b) award AXIS its reasonable attorneys' fees pursuant to contract;

(c) award AXIS its costs and expenses in this case; and

(d) provide AXIS all other just and proper relief.

| | |
|---|---|
| Dated:  August 19, 2019 | FAEGRE BAKER DANIELS LLP |

By: */s/ Kevin M. Toner*

Kevin M. Toner
Stephanie L. Boxell
Emily A. Kile-Maxwell
FAEGRE BAKER DANIELS, LLP
300 North Meridian Street, Suite 2700
Indianapolis, IN 46204
(317) 237-0300
Kevin.Toner@faegrebd.com
Stephanie.Boxell@faegrebd.com
Emily.Kilemaxwell@faegrebd.com

*Attorneys for Plaintiff AXIS Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Kevin M. Toner*